## CRAFT v. THE FRENCH QUARTER OF THE PALM BEACHES, Inc., et al.

No. 78-1151 CA (L) OI H.

Circuit Court, Palm Beach County.

January 16, 1979.

J. Michael Berman of Montgomery, Lytal, Reiter, Denney & Searcy, West Palm Beach, for the plaintiff.

Michael Puder-Harris and Virginia B. Puder-Harris, both of West Palm Beach, for the defendant French Quarter of the Palm Beaches, Inc.

ROBERT S. HEWITT, Circuit Judge.

Plaintiff Jerome W. Craft brought this action against the French Quarter of the Palm Beaches, Inc. ("the French Quarter") and View Line, Inc. ("View Line") for specific performance of an alleged contract for the purchase of townhouse unit No. 2201, and for damages. In their answer the defendants denied all the material alleagtions contained in plaintiff's complaint and counterclaimed for slander of title as a result of the notice of lis pendens which was filed against Unit No. 2201 by plaintiff.

In their joint pretrial stipulation filed with the court, the parties stipulated that the following facts would require no proof at trial—

1. Plaintiff is an individual residing in Palm Beach County, Florida.

2. The French Quarter and View Line are Florida corporations doing business in Palm Beach County, Florida.

3. On or about November 23, 1977 the plaintiff and the defendant the French Quarter entered into an alleged contract (hereinafter referred to as "option contract") for the purchase of certain real property. The option contract stated as follows —

OPTION CONTRACT FOR PURCHASE AND SALE

Received from Jerome W. Craft, Purchaser

residing at 1005 Country Club Dr.

The sum of $500.00 as a deposit on the purchase of a single family townhouse to be constructed on the project known as THE FRENCH QUARTER, Phase II Plat #2, in Wellington.

This deposit will be held in escrow by the Seller and will be returned to the Purchaser upon request at any time prior to the Purchaser's signing a Purchase Contract. This deposit is an option to purchase Unit #2201.

When Model is ready for viewing, the Seller will notify the purchaser. Purchaser will be given a full explanation at that time of the terms and conditions of purchase. Purchaser shall then have the option to accept the terms and to sign a Purchase Contract at which time the deposit will be credited toward the down payment.

THE FRENCH QUARTER
of the Palm Beaches, Inc.

By:_____

Joyce Gregg, Sales Manager

Purchaser

X   Jerome W. Craft
_____

Witness:

Sidney B. Decker

11/23/77

4. The plaintiff paid $500 as consideration for such option contract.

5. On November 23, 1977 the French Quarter had a contract to purchase the land on which Unit No. 2201, the southeasterly quarter of Lot 22, is to be constructed. On or about March 8, 1978 the French Quarter became the owner in fee simple absolute of such property. On or about September 11, 1978 the French Quarter sold the property to View Line and View Line is currently the owner in fee simple absolute of the property.

6. The French Quarter is still a real party in interest to this litigation by reason of the fact that it continues to control said litigation and stands to benefit from the litigation herein as more particularly described in the purchase and sale contract between the French Quarter and View Line.

7. On or about March 22, 1978 plaintiff filed a notice of lis pendens with the clerk of the circuit court in the fifteenth judicial circuit of Florida and mailed a copy thereof to the French Quarter's attorneys. The notice of lis pendens stated that the plaintiff's litigation was instituted. Thereafer on March 29, 1978 the plaintiff caused the notice of lis pendens to be recorded in official records book 2834, page 406, public records of Palm Beach County, Florida and since March 29, 1978 such notice of lis pendens has remained of record in Palm Beach County, Florida.

The case was tried before the court without a jury on November 15 and 16, 1978. The court has carefully studied all of the evidence and all of the parties' submissions, and makes the following findings of fact and conclusions of law —

### Findings of fact

1. On November 23, 1977 the plaintiff, a plastic surgeon, accompanied by his lawyer, who is also his son, Jerome R. Craft, went out to the French Quarter and entered into two transactions. The first consisted of a purchase of a townhouse unit in Phase I of the French Quarter, which purchase was evidenced by the execution of a four page purchase and sale agreement and a 10 percent deposit.

2. The second transaction consisted of the entering into the option contract set out above and a deposit of $500 for unit no. 2201 in Phase II.

3. Phase I and Phase II are distinct phases of the French Quarter's development with different outward appearance and different interiors. In November, 1977 the first phase was nearly completed and sold out; the second phase was just being commenced with the model itself under construction.

4. The townhouse unit which plaintiff purchased in Phase I was nearly completed when plaintiff entered into the purchase agreement on November 23, 1977 and the closing took place approximately one month later. Unit No. 2201 is not yet under construction and it is not known when construction will be commenced.

5. There were three persons present during the two transactions — plaintiff and his lawyer, and Sidney Decker, a real estate salesman employed by the broker for the French Quarter.

6. On the day in question plaintiff's son was acting as plaintiff's attorney and he is an expert in the field of real estate law. He is also a licensed real estate broker.

7. On the purchase and sale agreement for the purchase of the townhouse unit in Phase I, Jerome R. Craft requested that language providing for a co-brokerage fee to him be written into the agreement and such language was put in writing on such agreement. Jerome R. Craft did not request that such language be inserted into the option contract, and it was not done.

8. After the plaintiff signed the purchase and sale agreement for the unit in Phase I, Sidney Decker took the plaintiff and his lawyer for a ride in a golf cart to show them the location at which the unit they were considering in Phase II was to be constructed.

9. Sidney Decker is suffering from terminal lung cancer and appeared to be under great distress. He was the only witness who testified who has no interest whatsoever in the outcome.

10. There is no reference to price on the option contract. Prior to viewing the proposed site, Sidney Decker handed Jerome R. Craft a price list which quoted a price of $47,900 for Unit No. 2201. At the bottom of the price list in capital letters were printed the words "PRICES SUBJECT TO CHANGE WITHOUT NOTICE." Jerome R. Craft reviewed the option contact, and upon his lawyer's recommendation, plaintiff signed it. Jerome R. Craft did not request any changes to be made in the option contract.

11. The testimony concerning oral discussions about the price for Unit No. 2201 was in controversy. Jerome R. Craft testified that Sidney Decker told him that the price for Unit No. 2201 was $47,900 and that this was a firm pre-construction price. He also testified that when handed the proposed option contract, Sidney Decker also handed to him a second copy of the price list and that the two documents together created one contract. Jerome R. Craft testified that he did not request that the words "price $47,900 firm" be written on the option contract because he trusted Sidney Decker and his father had just purchased a unit in Phase I. Jerome R.

Craft testified that Sidney Decker told him that the standard contract for Phase II was not ready, and it was for that reason that the option contract was presented for his father's signature. Contrarily, Sidney Decker testified that he gave Jerome R. Craft only one copy of the price list and he did not give him a second copy when he handed him the option contract for his father's signature. He testified that price was never discussed but that he did hand him a copy of the price list earlier. He testified that neither plaintiff nor his son ever requested a contract for Phase II and that the option contract was clearly understood to be a reservation of location only. He also testified that he did not know that the standard contract for the Phase II units was ready.

12. The court further finds that while the plaintiff and his lawyer may have thought that plaintiff entered into a binding agreement for Unit No. 2201, Sidney Decker believed it was only a reservation subject to a condition precedent — execution of a standard purchase and sale agreement.

13. It is undisputed that the option contract and price list were not physically attached together, that Jerome R. Craft did not request that "$47,900" or "price $47,900 firm" be written on the option contract, that he did not request that the words "see page 2 attached" or "see price list attached" be inserted into the option contract.

14. It is also undisputed that after having learned from Sidney Decker that the Phase II contract was not ready, Jerome R. Craft did not ask to use a blank Phase I contract which on its face gave no indication of being inapplicable to a unit in Phase II. It was also undisputed that Jerome R. Craft did not request any language to be inserted into the option contract providing for a co-brokerage fee for himself. Moreover, it is undisputed that Jerome R. Craft did not ask that the phrase "terms and conditions" contained in the option contract be explained or modified so as to provide that any term relating to price was not acceptable.

15. It is undisputed that on November 23, 1977 there was no discussion regarding the closing time or place, the manner of payment, the type of conveyance to be delivered, the financing arrangements that would be acceptable to both parties, the payment of closing costs or procedures to be followed in the event of title defects discovered prior to closing.

16. The standard purchase and sale contract of defendants for Phase II contains an escalation clause which provides that unanticipated increases in developer's labor or materials which are beyond

developer's control may be added to the total purchase price but that within seven days of notice of such increase, purchaser may notify developer that he will not accept such increase and the agreement shall terminate and all monies previously deposited shall be refunded. Thus, the effect is only to pass on actual costs; it does not increase the developer's profit. Particularly since purchaser is permitted a full refund if he does not accept any increase, the clause is reasonable and certainly not unconscionable.

17. The policy of the French Quarter was to require the escalation clause in all purchase contracts for Phase II units where the unit was not under construction. View Line has continued this policy.

18. In accordance with the option contract, when the model for Phase II was completed, plaintiff was notified and a purchase contract was submitted for plaintiff's signature.

19. View Line, the present record title owner of the property upon which Unit No. 2201 is to be constructed is ready, willing and able to enter into a purchase contract with plaintiff for the purchase of Unit No. 2201 for the price of $47,900 if plaintiff will sign its standard purchase contract. View Line's standard purchase contract contains an escalation clause identical to that of the French Quarter.

20. The lis pendens filed by plaintiff imposed a cloud on title on the entire lot 22 of Phase II of the French Quarter. The testimony of John Schneider, Esq. on the impact of the lis pendens was uncontroverted that as long as the notice of lis pendens remains of record, View Line will be unable to obtain a construction mortgage on any of the four units to be constructed in building 22 even though plaintiff is only seeking to specifically enforce the purchase of one of the four units. Moreover, since unit numbers for the individual units do not appear on the plat for Phase II, there is no way to narrow the effect of the lis pendens other than by having it cancelled.

21. The French Quarter was damaged by the lis pendens in that it was required to give a $2,000 reduction on the price of Unit No. 2201 in the land sale transaction between it and View Line. Over 80 percent of the attorney's fees which were incurred in the negotiation for the land sale transaction between it and View Line resulted from the lis pendens filed by the plaintiff. In addition the French Quarter incurred attorney's fees as a result of prosecuting its counterclaim.

22. There is no way of estimating when the construction of Unit No. 2201 will be commenced nor the amount of increase or decrease in the cost of labor or materials that will be incurred.

*Conclusions of law*

*Burden of proof*

In a suit for specific performance of an alleged contract for the sale of real property, a plaintiff must do more than prove by a preponderance of the evidence that he is entitled to some relief. "He must prove the contract as alleged in his complaint by competent and satisfactory proof which must be clear, definite and certain." *Tumulty v. Severdija,* 233 So.2d 837, 839 (Fla. 3d DCA 1970).

*Options are treated as contracts*

While plaintiff claims that the option contract being sued on is distinguishable from a contract and thus lessens his burden of proof, the law is to the contrary. Indeed the remedy of specific performance is not applicable to an option, for prior to acceptance it is simply a unilateral agreement which is lacking in the mutual elements of a contract. The remedy of specific performance is available

> on the theory that the optionee has accepted the offer, and that the agreement has ceased to be merely an option, and has ripened, instead, into a mutually binding and enforceable contract. . . . The contract consummated by the exercise of an option is, of course, subject to all the principles and rules respecting suits for specific performance which ordinarily apply to contracts imposing mutual obligations. Thus, such a contract must be certain as to price, manner of payment, and description of the property. And if an option is so lacking in material parts that the acceptance thereof cannot make a complete contract, specific performance will not be decreed by the court.

29A Fla. Jur., *Specific Performance,* §93 at 711-713 (1967).

Plaintiff's testimony that he is ready, willing and able to enter into his interpretation of the alleged contract is sufficient to establish his acceptance of the alleged option. Otherwise, plaintiff's claim for specific performance would not have ripened into a justiciable cause of action. The court concludes that the issue of whether the option contract is sufficiently definite to support a decree for specific performance is squarely before the court.

*Lack of definiteness*

Taking all of the testimony of plaintiff and his son-lawyer at face value, and assuming all of plaintiff's testimony concerning oral conversations about price as true, this court finds and concludes that the option contract fails for lack of definiteness, that it "does not contain sufficient definity of the essentials and details of an agreement" to be subject to specific performance. *Benson v. Chal-*

*fonte Development Corp.,* 348 So.2d 557, 559 (Fla. 4th DCA), cert. denied, 354 So.2d 979 (1977). Thus, even assuming price was determined, all the other essential terms of a real estate contract such as the time and place of closing, the financing arrangements, type of mortgage, the type of conveyance to be delivered, the payment of closing costs, title insurance, brokerage and co-brokerage commission and the procedure to follow in the event of title defects are absent. To support specific performance, a contract for the purchase of real property must be clear, definite and certain as to not only the parties, the price, and the subject matter, but also as to "the mutual promises and miscellaneous terms." *Nichols v. MoAmCo Corp.,* 311 So.2d 750, 751 (Fla. 2d DCA 1975). "In suits for specific performance, the requirement as to certainty of the contract, which must be satisfied before a decree of specific performance can be granted, extends not only to the subject matter of the agreement and its purpose, but also to the parties to the contract, the consideration therefor, and even the place and time of performance, and extends also to the terms of payment and duration of the agreement . . ." 29A Fla. Jur., *Specific Performance,* §40 at 632-633. Accord: *Brown v. Dobry,* 311 So.2d 159, 160 (Fla. 2d DCA 1975); *Hart v. Freeman & Sons, Inc.,* 226 So.2d 708, 709 (Fla. 3d DCA 1969); *Lasseter v. Dauer,* 211 So2d 584, 585. (Fla 3d DCA 1968); *Tumulty v. Severdija, supra.*

There is no question that the alleged contract entered into between the parties does not clearly and definitely set out the place and time of performance, the terms of payment or any miscellaneous terms and conditions. There is even some question as to whether the description of the property contained in the option contract is sufficient since no geographical location within lot 22 nor a street address was included.

In each of the cases cited above — *Nichols, Brown, Hart, Lasseter,* and *Tumulty* — the price was clearly set out in the contracts sought to be specifically enforced and was not in controversy. Moreover, each of the contracts under consideration were more specific and contained more terms than the option contract before the court herein. Nevertheless, each claim for specific enforcement was denied because each contract was held to lack sufficient terms with sufficient clarity to be susceptible of specific performance.

The court finds the recent decision by Judge Alderman of the Fourth District Court of Appeal in *Benson v. Chalfonte Development Corp.,* supra, to be persuasive. In *Benson* the facts were almost identical to the facts in this case except that the alleged contract did definitely contain the price and other terms which

made it more clear than the option contract herein. While the appeal dealt with the issue of damages, Judge Alderman recognized the heavy burden which must be met for specific performance and that the remedy of specific performance would not have been available to the facts then before him: "it may well be that the agreements are not sufficiently definite to be susceptible of specific performance." 348 So.2d at 560. Thus, this court finds and concludes that the option contract is not sufficiently definite in order to support a decree for specific performance.

### *Lack of meeting of the minds*

Alternatively, plaintiff's claim must fail because there was no meeting of the minds and thus no contract was entered into. Sidney Decker testified that his understanding was that the option contract was a reservation for a specific location. The plaintiff and his son-attorney testified that they believed that it was a binding contract. In weighing the credibility of the witnesses, the court takes into account that Sidney Decker is suffering from terminal cancer and has no interest whatsoever in the outcome of the case. Contrarily the plaintiff and his attorney have a direct self-interest in the decision. Moreover Sidney Decker's testimony that he did not know that a contract had been prepared for Phase II and he did not know about the escalation clause which testimony was disadvantageous to his former employer enhances the credibility of the balance of his testimony. Although Jerome R. Craft testified that in his mind he did not care about any of the terms other than price, he did not testify that he communicated such intent to Sidney Decker. The court finds and concludes that at best there was never a meeting of the minds on all the material aspects of the transaction. " 'In order to create a contract, it is essential that there should be a reciprocal assent to a certain and definite proposition. So long as any essential matters are left open for further consideration, the contract is not complete, . . .' " *Goodman v. Goodman*, 290 So.2d 552, 555 (Fla. 1st DCA 1973), quoting from *Strong and Trowbridge Co. v. H. Baars and Co.*, 60 Fla. 253, 54 So. 92, 93 (Fla.). In rendering his decision that the option contract therein under consideration was not sufficiently definite to support a claim for damages, Acting Chief Judge Wigginton in *Goodman* explained that

> if a controversy resolves itself into a situation where one of the parties meant and intended one thing and the other meant and intended another, it is manifest that the first element of a contract, the mutual meeting of the minds of the parties, is lacking and there is no contract. Williston, in his work on contracts, proclaims the general rule to be that where a phrase of a contract is reasonably capable of different interpretations, and is in fact differently understood, there is no contract.

This court concludes that the option contract left open for future consideration a number of critically important aspects of the transaction and therefore never ripened into a purchase and sale agreement because there was never a meeting of the minds on all material aspects of the transaction nor an acceptance by the purchaser of a certain and definite offer by the seller.

Finally, having found Sidney Decker credible, the court concludes that even the price was not sufficiently determined with definitude. Crucial to this determination is the fact that Jerome R. Craft, an experienced real estate attorney and real estate broker, knew or should have known that he did not have the right to rely on an oral representation to such an important term as the price. The fact that such alleged oral representation was not reduced to writing indicates it probably was not made. This is particularly so in light of the fact that the price list which plaintiff relies on stated in writing "PRICES SUBJECT TO CHANGE WITHOUT NOTICE." Secondly, the fact that Jerome R. Craft inserted in the contract for the Phase I unit a provision for a co-brokerage fee for himself indicates that if indeed he had considered the second transaction to constitute a binding contract he would have inserted a similar provision for a co-brokerage fee. The failure of Jerome R. Craft to make any changes in the option contract shortly after having made a change on page 4 of the Phase I agreement underscores this court's conclusion that there was no meeting of the minds. Accordingly, there is no question that the option contract was not sufficiently definite and certain to compel specific performance.

### Reasonableness of escalation clause

Considering the uncertain real estate market, the fact that Unit No. 2201 is not yet under construction, and the fact that the purchaser may reject any increase and receive a 100 percent refund, the escalation clause is fair and reasonable.

The option contract provided that when the model was ready, the terms and conditions of the contract would be explained. The court finds that this was done and that the French Quarter had a right to include the escalation clause as a term and condition of its standard contract for Phase II.

The court finds and concludes that while plaintiff has a right to reject the contract offered by defendant-developer, the plaintiff is not entitled to unilaterally rewrite it. As an experienced real estate attorney, Jerome R. Craft knew how to create a binding real estate contract. Yet he did not do so, and the court at this time will not rewrite either the option contract or the standard purchase contract for Phase II of the French Quarter.

## Plaintiff's claim for damages

Concerning plaintiff's claim for damages, the testimony presented and the arguments of plaintiff's counsel indicated that plaintiff was not pressing his claim for damages and indeed plaintiff presented no proof of out-of-pocket loss which would support an award for damages. The court finds and concludes that any evidence concerning damages consisted of mere speculation and accordingly plaintiff's claim for damages must be dismissed.

## Counterplaintiffs' claim for slander of title

The court finds and concludes that the essential elements required for a basis of recovery by defendants for slander of title were complied with — (1) a statement disparaging defendants' title (the notice of lis pendens), (2) which was communicated to a third person (recorded), (3) which was not true in fact, and (4) which caused the defendants actual damage. *Continental Development Corporation of Florida v. Duvall Title and Abstract Company*, 356 So.2d 925, 927 (Fla. 2d DCA 1978); *Gates v. Utsey*, 177 So.2d 486, 488 (Fla. 1st DCA 1965). The court concludes that the French Quarter suffered an actual out-of-pocket damage of $2,000 plus the attorney's fees incurred as a result of the lis pendens in the land purchase transaction between the two defendants as well as the attorney's fees incurred in connection with prosecution of its counterclaim. As stipulated by the parties, a further hearing shall be held to determine the amount of such attorney's fees at a date to be noticed by counterplaintiffs.

## Conclusion

For all the foregoing reasons, the court concludes that plaintiff has not established either his claim for specific performance or for damages and defendants are entitled to final judgment in their favor on plaintiff's claims. Moreover, the court concludes that the defendants-counterplaintiffs are entitled to recover on their counterclaim for slander of title damages in the amount of $2,000 plus attorney's fees, the amount of which will be determined at a later hearing.

Simultaneously with the entry of these findings of fact and conclusions of law, the court shall enter its final judgment which shall incorporate by reference these rulings.

*Final judgment:* This case having been tried before the court without a jury, and findings of fact and conclusions of law having been duly entered by the court, it is ordered and adjudged as follows —

1. Plaintiff Jerome W. Craft is not entitled to a decree of specific performance, shall recover nothing on his claim against defendants the French Quarter of the Palm Beaches, Inc. and View Line, Inc. for damages, and plaintiff's claim is hereby dismissed with prejudice.

2. The notice of lis pendens filed by plaintiff against that certain real property specifically described as Unit No. 2201, the southeasterly quarter of Lot 22, Plat II, the French Quarter of Wellington, and recorded in official record book 2834, page 406, public records of Palm Beach County, Florida is hereby cancelled and declared to be null and void, and of no effect.

3. Counterplaintiff the French Quarter of the Palm Beaches, Inc. shall recover from counterdefendant Jerome W. Craft the sum of $2,000 together with its reasonable attorney's fees on its counterclaim for slander of title and its taxable costs, for all of which let execution issue.

4. Jurisdiction is reserved for purposes of entry of judgment with respect to reasonable attorney's fees and taxable costs.